[S. C., 1 Tenn., 201.]
Injunction Bill. — Castleton Brooks, the father of Mrs. Brice, in the year 1774 made an improvement, built a cabin, and settled on lands in Hickey Cove (now in Hawkins county). In the next year he cleared and cultivated part of the land, and continued in possession till the year 1776 or 1777, when he was killed by the Indians, leaving only one child, a daughter, who at the time of his death was about six or seven months old; who afterwards, when she was sixteen or seventeen years of age, intermarried with the defendant. William Brice. Ever since the death of Castleton Brooks, the land where he settled has been held in possession by, or in behalf of, his heir. Shortly after the settlement made by Brooks. Samuel Wilson. Son., father of the complainant, came and took possession of a cabin which Jones Little had built, about three-quarters of a mile from Brooks's cabin, and continued in possession ever since. Little's cabin was built subsequent to the settlement of Brooks. The defendant Kilcannon, an uncle of the child, made an entry, in the office commonly called Adair's office, in the following words: "No. 53, Sullivan county, February the 8th, 1780, Andrew Kilcannon enters 500 acres of land for Castleton Brooks's orphan, lying in the Hickory Cove, where said Brooks lived." Pursuant to the entry, a survey was made for 473 acres, and a grant issued on the 12th of October, 1783, to Andrew Kilcannon in trust for the heirs of Castleton Brooks.
Samuel Wilson, Sen., also made an entry in Adair's office, as follows: "Sullivan county, February the 8th, 1780, No. 13. Samuel Wilson enter 640 acres of land in Hickory Cove adjoining Castleton Brooks's place and Henry Turney's, from thence to the mountain for complement," and procured a grant thereon *Page 183 
for 513 acres, dated the 18th of May, 1789. In January, 1779, Jones Little made an entry in the office commonly called Carter's office (the place where the lands in dispute lie being at that time in Washington county): "Washington county, January the 2d, 1779, No. 946, Jones Little enters 640 acres of land on the waters of the north side of Holston River in the Hickory Cove, including the land Samuel Wilson claimed and sold to John Carter for William Roe." This entry was by order of Jones Little, transferred to Jonathan Langden, who procured a warrant thereon, removed it to other land, and obtained a grant dated the 27th of November, 1792. Jones Little afterwards by order transferred his entry to Samuel Wilson, Sen., who procured a duplicate warrant thereon, and a grant in his own name, dated the 12th of November, 1795. Both these grants to Samuel Wilson, Sen., interfere with and cover part of the land granted to Kilcannon in trust for the heirs of Brooks. None of the defendants, or any person for them, have been in possession of that part of the land in dispute. Samuel Wilson, Sen., in the year 1789 or 1790, took possession of the disputed part. That possession has ever since been continued by him, and those claiming under him. In the year 1800, the defendants to this bill commenced an action of ejectment against him, and recovered judgment, to enjoin which judgment this bill was filed, and is now prosecuted by Samuel Wilson., Jr., who claims title by purchase at sheriff's sale on executions issued by Samuel Wilson, Sen. Upon this statement it is to be decided which of these titles ought in equity to prevail. It may be remarked that Brooks's heir was entitled to enter 640 acres, she entered only 500, and obtained a grant for only 483. Her grant would have extended further towards the clearing of Wilson than it does had the full complement been claimed. As to the argument that Brooks should have extended his surrey on the opposite side of the *Page 184 
tract, and to have left thereby the lands in dispute uncovered by his grant, it is observable that both entries of Wilson, admit on the face of them the priority of Brooks's claim. The one calls to be bounded by it, the other is for the lands of Wilson which he sold to Carter for Roe. The same tract is meant in both. How then did the law direct Brooks's claim to be surveyed? For wherever he could legally extend to, the other could not legally include in his survey any part of the lands within that extent until after Brooks's situation was identified by surveying. Now when an improvement or other object is called for in the entry, such as a spring, sinkhole, hill, or buffalo wallow, or the like, the survey may include it in any part of its bounds, — either in the centre, or on one side, or in one corner, and that any of the four corners of a square or oblong. Laying off the land in dispute in this way, the boundary in controversy would have gone nearer to the improvement of Wilson than it does, and take more of the land he claims. The several short lines made on the side next to Wilson's improvement, forming a circular figure on that part of the tract, were for the advantage of Wilson, leaving Mm more land than a direct line would have left him. Therefore it is not to be complained of by him for this cause. If Wilson, under such circumstances, make his survey first, he can not complain when Brooks by his survey, afterwards made, takes a part included by Wilson, which, but for Wilson's survey, he might legally have included in his own. Wilson ought either to wait till Brooks's survey had been made, or should have steered clear of every part which it might legally comprehend when surveyed in any shape the law allowed of. Brook's survey does not comprehend any lands which could not legally be included in his survey, and therefore his survey is unimpeachable.
Wilson, however, claims title under the statute of limitations, and he has been in possession of part *Page 185 
of the lands in dispute under his grant of 1789 ever since the date thereof. Of another part of the land in dispute he has been possessed under a grant ever since the date of his grant of 1795; for this part is not covered by his grant of 1789, but by that of 1795 only. His entry did not extend to it, and, if it did, any equitable claim by bond only, or the like, which is known to the possessor not to be a legal title, is not any color of title which can be ripened into a perfect legal title by possession. Color of title is where the possessor has a conveyance of some sort by deed or will or inheritance which he may believe to be a title. This can not be said of any bond or entry which only entitles the party to a legal conveyance hereafter. Every one knows that is not a title, and of course can not improve under it with a belief that he is improving under a legal title. Seven years' possession has intervened between Wilson's first possession under his grant of 1789 and the commencement of an action at law on the part of Brooks's heirs. Therefore, as to the part in dispute which is covered by that grant, this possession will give him a title unless the heirs of Brooks be found to be within the exceptions mentioned in the act of limitations in favor of persons under disabilities. As to the part covered by the grant of 1795, seven years did not elapse after his possession of that part was accompanied by his grant of 1795, and therefore the title of Brooks's heirs is not barred as to that part; but is the other part, covered by the grant of 1789, secured to the Brooks's heirs by the exception of the statute? If Kilcannon had the legal title by the grant, he then is trustee for the daughter of Brooks now married to Brice, and he is barred as to ail those persons who have been in possession for seven years under color of title adversely. The exceptions are in favor of those who could sue in ejectment were it not for the disabilities excused, not in favor of those who could not sue at all in *Page 186 
ejectment, though under no disabilities. The exceptions enabled the excused party to sue, after the removal of disabilities, as they might hare done but for them. Now a cestui que trust, although under no disability, could not sue the party in possession by ejectment; for this is an action at law supported by a legal title, which thecestui que trust does not pretend to have. Having no right to sue at law, the cestui que trust need not be, and can not be, excused for not suing. The trustee ought to sue in ejectment, and if he does not, his legal estate is barred, and of course can never be conveyed by him to the cestui que trust whose claim is to this estate, which he can not have, having passed from the trustee irrevocably. But then the question arises, Is Kilcannon a trustee? The grant is to him, "in trust for the heir of Brooks." Now he who is seised of the legal estate in trust for another is seised to his use; and, by the statute of uses, the legal estate is transferred to the use. 2 Saund. 11, note 17, and the transferred to the use. 2 Saund. 11, note 17, and the cases there referred to. And the legal estate vests in him who has the use. Then the daughter of Brooks is the legal owner, and Kilcannon but a vehicle through which the legal estate is conveyed into the cestui quetrust. And if the legal estate in fee be in the heir of Brooks, then the remaining question will be, whether her disability by infancy, being not determined before her disability by coverture commenced, she is within the benefit of the exception in favor of femes covert
and infants. Being equally disabled in both instances, she ought equally to be excused in each for not suing during the time of their existence. It would be unreasonable to say she shall be excused because she could not sue, in one instance, but shall not be excused in the other, when in that also she could no more sue than in the other. There is no ground in reason for a difference. It follows that Wilson was not protected by the statute of limitations, either as to the *Page 187 
lands in dispute, holden under the grant of 1789 or of that holden under the grant of 1795.
Decree that Wilson's bill be dismissed with costs.